IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KEITH WEBB-EL | * | |
| Petitioner | * | |
| v | * | Civil Action No. PWG-13-2785 |
| TIMOTHY S. STEWART | * | |
| Respondent | * | |

\*\*\*

## MEMORANDUM OPINION

Respondent has filed a court-ordered limited response to the above-captioned petition for writ of habeas corpus.[1] Gov't's Limited Resp., ECF No. 17. Petitioner filed a reply as well as a motion to amend the relief sought. Pet'r's Reply, ECF No. 21; Pet'r's Mot. to Am. Relief, ECF No. 23. For the reasons stated below, the petition shall be dismissed.

### Background

Petitioner, a prisoner confined at Federal Correctional Institution (FCI) Cumberland, Maryland, was sentenced to serve life imprisonment on September 19, 1985, after being convicted of second-degree murder in the United States District Court for the Western District of Texas. Pet. 2, ECF No. 1. He asserts a claim of actual innocence. *Id.* at 9. The facts adduced at trial were summarized by the Fifth Circuit Court of Appeals and are set forth below.

> Fort Bliss is a military reservation located in El Paso, Texas. June Webb was a soldier in the United States Army stationed at Fort Bliss at the time of the events in issue in this appeal. June Webb resided in military housing on the base, along with her putative husband Keith Webb, the defendant in this case. Between one and two o'clock in the morning of September 6, 1983, June Webb and Keith Webb appeared at the Criminal Investigation Division (CID) office at Fort Bliss ostensibly to report that June Webb had been raped. Once June Webb was physically separated from Keith Webb in the CID office, June

---

[1] Petitioner supplemented the petition. ECF Nos. 4, 7, 11, 14, 15 and 16.

Webb asserted that Keith Webb had killed her son, Steve Marcel Wilson, some weeks earlier.

After obtaining further details from June Webb, the CID agents approached Keith Webb stating that they desired to question him about an alleged homicide. Keith Webb fled the CID office area into the dark, and the agents were unable to locate him. Approximately six hours later, the CID was notified that an unknown individual was on top of a communications tower near the CID office and was threatening to commit suicide. When the CID agents arrived at the tower they were able to identify the individual as Keith Webb. Almost immediately upon being spotted by the CID agents, Webb shouted that if they would get his wife and a priest, he would tell them where the body was buried.

While on the tower, Webb threatened to commit suicide. Unable to persuade Webb to come down from the tower, the CID agents summoned an army psychiatrist and CID crisis negotiator. By means of a mechanical device known as a "cherry picker", the psychiatrist and negotiator were elevated to a position near the tower where they could communicate with Webb. Initially, Webb was much higher on the tower than the negotiators, but he eventually came down to their level. In order to take Webb's mind off his threatened suicide, and to talk Webb down from the tower, the negotiators engaged Webb in a continuing dialogue. While on the tower, Webb repeatedly confessed to the psychiatrist and negotiator, stating that he had bashed his son's head against a wall, that he had scalded his son, that his son had died, and that he had buried him in the desert. Neither the psychiatrist nor the negotiator gave Webb Miranda warnings.

At approximately 10:00 a.m. Webb climbed down from the tower, was handcuffed and advised of his rights. Webb indicated that he wanted a lawyer before he would answer any questions. Webb was then taken to the CID office and allowed to see June Webb, as Webb had requested. Upon seeing her, Webb stated, "Well, if I'm going down, you're going down with me, so you might as well tell them you're a part of it." Webb was then allowed to sleep on a couch.

At 11:00 a.m. FBI agents arrived at the CID office. Webb was again given Miranda warnings, and Webb for the second time requested counsel before answering questions. The FBI agents then left to conduct their initial investigation of the alleged homicide. At 1:55 p.m. the FBI agents returned to the CID office and formally arrested Webb. The FBI agents again advised Webb of his rights, and for the third time Webb requested an attorney. Webb was then taken to the FBI office, where he was fingerprinted, photographed, and advised of his rights. For the fourth time, Webb asked for an attorney. At each request for an attorney, the agents properly ceased questioning Webb. The FBI agents then booked Webb into the El Paso County Jail at approximately

3:00 p.m. on September 6, 1983. The booking card stated that Webb was charged with murder on a federal reservation.

The FBI agents returned to their office to prepare a complaint so that Webb could be presented to a magistrate that day. A complaint was presented to a magistrate at 5:15 p.m. that evening, but the magistrate found the complaint unacceptable. The magistrate directed the agents to redraft the complaint and present Webb at 11:00 a.m. the following day. Webb eventually was presented at the designated time on September 7, 1983.

Meanwhile, at the El Paso County Jail, Officer Simmons, the classification officer on duty, allowed Webb to make a telephone call and then gave Webb something to eat and drink. According to Simmons, in order to determine where in the jail population to place Webb, Simmons asked Webb, "[W]hat kind of shit did you get yourself into?" According to Simmons, Webb's surprising reply was: "I murdered my son and buried him in the desert." Simmons then asked Webb, "Don't you think it be better if he got a Christian burial?" And then Simmons further asked, "Would you like to talk to the people that brought [you] here?" Webb indicated that he did want to talk to the FBI agents. Simmons relayed this information to his superior officer. The FBI was contacted at about 4:15 p.m. and given the message that Webb wished to talk with them.

Two hours later the FBI agents arrived at the jail. The agents again advised Webb of his rights and asked him if he wanted to talk to them. Webb signed a form waiving his rights. After trying to explain where he had buried his son, Webb agreed to lead the agents to the grave. Webb was not questioned on the trip to the grave. Webb indicated where the agents should drive and stop the car; he then walked them to within a few feet of the grave. Webb identified the grave by stating, "There's Stevey."

On the way back to jail, Webb asked the agents what would happen next. The agents began explaining the procedures that would begin with Webb's appearance before the magistrate the next day. Webb, however, wanted to talk about the events leading up to the death of his son. Webb gave the agents a detailed explanation of how his son died, stating that he (Webb) had bashed the child's head against the wall until a soft spot in the skull developed. The child suffered seizures thereafter. Webb also admitted placing the boy in a tub of scalding water to punish the child. After that, the boy's legs began to peel, he became lethargic, and eventually he died. Webb then related how he had wrapped the boy's body in a brown blanket and buried the body in the desert.

*United States v. Webb*, 755 F. 2d 382, 385 – 86 (5th Cir. 1985) (*Webb I*) (internal record citations and footnotes omitted).

Petitioner represented himself at trial and maintained his confessions were not voluntary and violated his constitutional rights under the fifth, sixth, and fourteenth amendments. *Id.* at 387. On appeal the Fifth Circuit agreed that statements petitioner made while he was on the tower threatening suicide were properly admitted at trial, but others made while he was in custody were not properly admitted. *Id.* at 388-89 (finding petitioner invoked his right to have counsel present during custodial interrogation, but was nonetheless initiated in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981)). The appellate court reversed petitioner's convictions and remanded the case to the district court for a new trial. *Webb*, 755 F. 2d at 392.

After a second trial by jury, petitioner was again convicted of one count of murder in violation of 18 U.S.C. §1111 and two counts of injury to a child in violation of Texas Penal Code §22.04. *United States v. Webb*, 796 F. 2d 60, 61 (5th Cir. 1986) (*Webb II*). On appeal, petitioner alleged the convictions should be overturned because the victim's body was erroneously admitted into evidence under the inevitable discovery exception; the convictions violated double jeopardy; he was denied effective assistance of counsel; there was a "fatal variance" between the indictment and the proof adduced at trial; prosecutorial misconduct rendered the trial unfair; and he was denied due process. *Id.* at 62.

Petitioner's convictions were affirmed by the Fifth Circuit, ruling the admission of the child's body was permissible under the inevitable discovery rule; that the convictions did not violate double jeopardy; and that counsel was not ineffective. *Id.* at 62–64. Petitioner's assertion that a fatal variance occurred between the indictment and the evidence submitted at trial because the indictment named the victim as petitioner's son, but no evidence was introduced to prove the body was petitioner's son, was rejected by the appellate court. The Fifth Circuit held that there was sufficient evidence introduced at trial that would allow the jury to find beyond a

reasonable doubt that the victim was petitioner's son. *Id.* at 64. Additionally, the Fifth Circuit rejected petitioner's claim there was prosecutorial misconduct. *Id.* at 64–65.

Following his appeal, petitioner filed motions to vacate pursuant to 28 U.S.C. §2255 on at least four prior occasions[2] and his appeals of the sentencing court's denial of these motions were unsuccessful. *United States v. Webb*, Crim. Case HLH-83-172 (W.D. Tex) at Docket Nos. 154, 184, 197, and 199. The most recent motion to vacate was denied on August 31, 2004, and a subsequent appeal resulted in a decision affirming the dismissal. *Id.* at Docket Nos. 200 and 206. The instant petition for writ of habeas corpus was filed pursuant to 28 U.S.C. §2241 on September 19, 2013, based on petitioner's custody in the jurisdiction of this court.

## Petitioner's Claims

In the initially filed petition for writ of habeas corpus, petitioner claims he suffers from "diminish[ed] capacity" due to schizoaffective and bipolar "multiple personality disorder." Pet., ECF No. 1 at 9. He states he could not conform his behavior with federal law and, therefore, did not act "unlawfully, willfully, knowingly, and intentionally to take the life" of his son because of his mental disorder. *Id.* Petitioner further asserts that all of the attorneys who represented him provided ineffective assistance of counsel because they knew he had climbed a 150 foot tower and threatened to kill himself for eight hours, but they failed to file motions with the court for a competency hearing to determine if "petitioner was competent during the commission of the offense." *Id.* at 10. Petitioner argues that this failure deprived him of due process and equal protection. Petitioner assigns further error to the court and to "all of the attorneys" because he was given a psychological evaluation resulting in a diagnosis of bipolar and multiple personality disorder which was sealed. He states this deprived him of an insanity defense. *Id.* at 11.

---

[2] The electronic docket for the criminal case in the Western District of Texas begins in 1996.

5

Petitioner claims that it was also error to allow him to proceed pro se at trial because it was known that he suffered from "bipolar multiple personality disorder." *Id.* He states his mental disorder rendered him "ineffective to have represented himself at trial." *Id.*

Petitioner asserts a claim of actual innocence and relies upon his own affidavit verifying that there exists a sealed psychological evaluation diagnosing him with "bipolar multiple personality disorder." He concludes that no reasonable juror would have found him guilty of murder had the mental evaluation been available and an insanity defense presented at trial. *Id.* at 12. In addition, he attaches one page of a treatment plan developed by prison treatment professionals which list as his diagnosis "schizoaffective disorder – bipolar type"[3] and documents that he has a history of acting out violently and experiencing auditory hallucinations. Psychology Data System Report, Pet. Ex. A., ECF No. 1-1. Also attached is one page of petitioner's parole consideration hearing report which relates that petitioner's psychologist, Dr. Larry Karpen, told the United States Parole Commission that petitioner suffers from a psychotic disorder and was abusing substances at the time of his offense. Hearing Summary, Pet. Ex. A, ECF No. 1-1. Neither document mentions a sealed mental evaluation performed at the time of trial.

In his motions to amend and clarify, petitioner states he did not receive the medical record or the summary report from the Parole Commission until July of 2013, both of which he alleges corroborate the existence of a sealed 1983 mental evaluation diagnosing him with a

---

[3] People with schizoaffective disorder "experience psychotic symptoms, such as hallucinations or delusions, as well as mood disorder. The mood disorder is either bipolar disorder . . . or depression. . . . Psychotic features and mood disturbances may occur at the same time or may appear on and off interchangeably. The course of schizoaffective disorder usually features cycles of severe symptoms followed by a period of improvement, with less severe symptoms." *See* http://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/basics/symptoms/con-20029221.

6

mental disorder. Pet'r's Mot. to Am., ECF No. 7. He further asserts that he did not become aware of the significance of the evaluation until he read case law on August 13 2013.[4] Pet'r's Mot. to Amend; Pet'r's 2d Mot. to Clarify, ECF No. 11. He reasserts the claims raised in his petition and adds he is raising a claim of actual innocence in light of his affidavit verifying there is a sealed mental evaluation diagnosing him with a mental disorder at the time of trial. Pet'r's 3d Mot. to Clarify, ECF No. 14. He further contends that the government failed to prove at trial beyond a reasonable doubt through scientific testing that the alleged victim was male or female, failed to prove cause of death, and failed to prove through DNA testing that the body was his son. Pet'r's 4th Mot. to Am. 2, ECF No. 15. He adds a claim that the failure to hold a competency hearing to determine if he was competent to stand trial violated his right to due process because the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Id.* at 4 (citing *Drope v. Missouri*, 420 U.S. 162 (1975)). He adds to his claim regarding his waiver of his right to counsel that a competency hearing should have been held to determine if he was doing so knowingly, intelligently, and voluntarily. *Id.* at 5. Petitioner also asserts a claim, raised in his initial appeal from the first trial, that his water tower confession was admitted into evidence despite the fact it was involuntarily given without benefit of a *Miranda*[5] warning. Pet'r's Addendum 1–5, ECF No. 16. He adds to that claim that his statements while on the water tower were "the product of an irrational mind set." *Id.* at 5.

Petitioner's affidavit attesting to the existence of a sealed mental evaluation performed in September or October 1983, simply states he was evaluated and diagnosed with "bipolar multiple personality (schizophrenia) disorder." Aff. in Supp. Of Pet., Pet. Ex. B, ECF No. 1-2. He

---

[4] Petitioner cites *Hopper v. Garraghty*, 845 F. 2d 471 (4th Cir. 1987), *United States v. Chandler*, 939 F. 2d 920 (4th Cir. 1966), and *United States v. Shaffer*, 2 F. 3d 999 (10th Cir. 1993).

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

further states that the Public Defender's Office in El Paso, Texas had the evaluation done and then had the District Court seal the record. *Id.* The affidavit, together with petitioner's assertion that he only recently learned of its legal significance, is the "new evidence" upon which he relies for his actual innocence claim. *Id.*

## Standard of Review

The threshold question presented here is whether this claim properly is raised in a § 2241 petition or more properly is construed under 28 U.S.C. § 2255. A writ of habeas corpus pursuant to 28 U.S.C. § 2241 and a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 are separate and distinct mechanisms for obtaining post-conviction relief. A § 2241 petition attacks the manner in which a sentence is executed. *See* 28 U.S.C. § 2241(a). By contrast, a § 2255 motion challenges the validity of a conviction or sentence. *See In re Jones*, 226 F.3d 328, 332 (4th Cir. 2000); *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997) (en banc).

Although a federal prisoner generally may not seek collateral relief from a conviction or sentence by way of § 2241, there is an exception under the so-called "savings clause" in § 2255.[6] It provides a prisoner may seek relief under § 2241 if the remedy under § 2255 is "inadequate or ineffective to test the validity of his detention." 28 U.S.C. § 2255. In *Jones,* the United States Court of Appeals for the Fourth Circuit held that § 2255 is inadequate and ineffective to test the legality of a conviction when: (1) at the time of conviction, settled law of this circuit or the Supreme Court established the legality of the conviction; (2) subsequent to the prisoner's direct

---

[6] 28 U.S.C. § 2255 provides in relevant part:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

8

appeal and first § 2255 motion, the substantive law changed such that the conduct of which the prisoner was convicted is deemed not to be criminal; and (3) the prisoner cannot satisfy the gatekeeping provisions of § 2255 because the new rule is not one of constitutional law. *Jones*, 226 F.3d at 333–34.

## Analysis

In its limited response, Respondent asserts that the instant petition does not satisfy the savings clause and, as a motion to vacate under 28 U.S.C. § 2255, the petition is dismissible as having no merit. Gov't's Limited Resp. 8–9, ECF No. 17. In addition, respondent asserts petitioner's actual innocence claim is not based on reliable evidence and is unsupported. *Id.* at 9–11. In reply, petitioner asserts there was a substantive change in the law following his direct appeal in 1986 and his first § 2255 motion that changed the standard by which statements provided to police without a *Miranda* warning was changed. Pet'r's Reply 3 (citing *Dickerson v. United States*, 530 U.S. 428 (2000)), ECF No. 21. In addition, he claims the gatekeeping provisions of 28 U.S.C. § 2255(h) may not be applied retroactively to his case since his conviction was final before it was passed, and that because his petition is based on a claim of actual innocence, his claim is cognizable as a § 2241 petition. Pet'r's Reply 3–7.

### Actual Innocence

In *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), the Supreme Court instructed that a federal habeas court faced with an actual innocence claim should not count unjustifiable delay as an absolute barrier to relief, but it should be weighed as a factor in determining whether actual innocence has been reliably established. *Id.* at 1935-36. In addition, the Court cautioned that "tenable actual-innocence gateway claims are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror,

acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* at 1928, quoting *Schlup*, 513 U.S. at 329.

The *Perkins* decision did not create a new right to habeas review, nor did it change existing law. Rather, it simply clarified the "actual innocence" standard as a gateway to habeas corpus review. "'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). New evidence may consist of "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence." *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citation omitted). The new evidence must be evaluated with any other admissible evidence of guilt. *See Wilson v. Greene*, 155 F.3d 396, 404–05 (4th Cir. 1998). The new evidence must do more than undermine the finding of guilt; it must affirmatively demonstrate innocence. *See Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999). To invoke the actual innocence exception to the procedural default doctrine, a defendant "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327.

Petitioner has presented no new evidence of an exculpatory nature; rather, he simply has presented this court with his own affidavit asserting that a sealed mental evaluation performed shortly after the time of the offense was not relied upon to order a competency hearing. There is no allegation that petitioner was unaware of the evaluation at the time it was performed, nor that the trial court was unaware of it. Petitioner does not claim, nor could he claim, that the evaluation finding that he suffers from a mental illness, standing alone, would have established that he was legally insane at the time he murdered his son. To the extent it may have raised a question regarding his competency to stand trial, that does not mean he was incapable of acting

with criminal culpability at the time of the offense. The additional evidence presented, ostensibly to corroborate petitioner's affidavit, says nothing more than that petitioner was abusing substances and under a great deal of stress at the time of the offense. The statement does not establish petitioner was mentally ill at the time of the offense such that he was incapable of conforming his behavior to the law. Thus, petitioner's actual innocence claim is without merit.

## 28 U.S.C. § 2255(h)

The purported change in law that petitioner relies upon is not sufficient to warrant review of his claims under the savings clause of § 2255. The case relied upon by petitioner held in part that 18 U.S.C. § 3501 was unconstitutional to the extent it was a legislative attempt to overrule the Supreme Court's decision in *Miranda* by omitting any warning requirement as a touchstone for determining the voluntariness of a confession. *See Dickerson v. United States*, 530 U.S. 428, 437 (2000). The provisions of § 3501 required the trial court to consider "a nonexclusive list of factors relevant to the circumstances of a confession" and designated "voluntariness as the touchstone of admissibility." *Id.* Petitioner asserts that the finding that § 3501 is unconstitutional negates the finding that his water tower confession, provided in the absence of a *Miranda* warning, was voluntary.

In holding that petitioner's water tower confessions to the psychiatrist and negotiator did not run afoul of the holding in *Miranda*, the Fifth Circuit observed that petitioner "failed to demonstrate that the interchange among [petitioner], the psychiatrist, and the negotiator constituted interrogation" and "[t]herefore, we conclude that the statements Webb made while on the tower are admissible." *Webb I*, 755 F. 2d at 390–91. In so holding, the Fifth Circuit found that the protections set forth in Miranda did not apply to the conversation held with petitioner while he was on the water tower threatening suicide, thus the repeated confessions he made

while there were admissible at trial. *Id.* The holding in *Dickerson* regarding § 3501 is of no relevance to the analysis and does not conform to the requirements of the savings clause.

Having failed to satisfy the elements of the savings clause in § 2255(h), the instant petition is not appropriately reviewed under 28 U.S.C. § 2241, and is more appropriately reviewable under 28 U.S.C. 2255 as a motion to vacate. This court lacks jurisdiction to consider a motion to vacate a criminal conviction emanating from the Western District of Texas. As observed by respondent, the matter may be transferred to that court or dismissed with prejudice upon determination that it plainly is without merit. *See Phillips v. Seiter*, 173 F. 3d 609, 610 (7th Cir. 1999) (where court lacks jurisdiction and limited review reveals case is a "sure loser" dismissal is more appropriate so that judicial resources are not wasted).

As a motion to vacate, the instant case is untimely and successive. Petitioner's conviction became final in 1986, was tested on appeal twice, and was denied certiorari on January 12, 1987. The instant petition was filed fifteen years after the effective date of AEDPA. *See Brown v. Angelone*, 150 F.3d 370, 375 (4th Cir. 1998) (filing deadline for those convicted before passage of AEDPA is April 23, 1997, or one year from the date of passage). It also is clear that petitioner has filed numerous motions to vacate in the Western District of Texas, which have been summarily dismissed by that court. Finally, the claims asserted have been recycled with little to no changes from those asserted on appeal.

Thus, absent any meritorious claim warranting the additional expenditure of judicial resources, the petition shall be dismissed. A certificate of appealability shall not issue in light of the fact that there has been no substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2). *See also Slack v. McDanial*, 529 U.S. 473, 484 (2000). A separate order follows.

09/15/2014
Date

Paul W. Grimm
United States District Judge